IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
*Electronically Filed*

CITY OF CROSSGATE,                          )
                                            )
            Plaintiff,                      )
                                            )
v.                                          )
                                            )          Civil Action No. 3:18-cv-167-DJH
UNITED STATES DEPARTMENT                    )
OF VETERANS AFFAIRS, et al.                 )
                                            )
            Defendants,                     )
                                            )

---

**PLAINTIFF'S MOTION TO COMPLETE THE ADMINISTRATIVE RECORD, OR IN THE ALTERNATIVE, TO SUPPLEMENT THE ADMINISTRATIVE RECORD**

---

### INTRODUCTION

Plaintiff, City of Crossgate, Kentucky ("Crossgate"), brought this action pursuant to 28 U.S.C. § 1331, challenging the issuance of a Record of Decision ("ROD") by the United States Department of Veterans Affairs ("VA") regarding a Replacement Robley Rex VA Medical Center ("VAMC") in Louisville, Kentucky. The Record of Decision and Final Environmental Impact Statement were completed without a full and adequate environmental review as required by the National Environmental Policy Act ("NEPA"). The proposed VAMC comprises a massive greenfield project that would be designed and constructed over multiple years and result in a complex covering nearly 40 acres, approximately 1,000,000 square feet of building space, servicing over 1500 patients per day, and profoundly impacting the traffic, transportation, and land use patterns in the area. The total cost of the project is estimated at over one billion dollars.

Crossgate hereby moves to Complete the Record, or in the alternative, to Supplement the Administrative Record to add any internal or external VA documents concerning the acquisition by the VA of the Brownsboro Midlands site ("Midlands site" or "Midlands") prior to completion of the NEPA environmental review process including, but not limited to: all documents and correspondence relating to the acquisition of the Midlands site as well as all documents and correspondence related to the consideration of acquiring alternative sites. The theory of the Plaintiff's case is that the environmental analysis regarding the replacement site selection of the proposed VAMC was skewed and prejudicially affected by the acquisition of the Midlands site prior to the completion of the NEPA analysis, in a manner inconsistent with specific prohibitions on such actions under VA and NEPA regulations.

Plaintiffs' challenge also relates to the questionable appraisal of the Midlands site, which was completed in a manner inconsistent with controlling VA regulations and was purchased at a significant, unexplained premium. Because Crossgate is not in possession of any of these internal or external documents concerned the decision-making process to acquire the Midlands site, Crossgate first completed a Freedom of Information Act ("FOIA") Request dated January 6, 2017 requesting copies of this information. See Exh. 1, *VA Response to First FOIA Request*. After appealing the initial fee determinations, on April 3, 2017, the VA entered a final administrative decision on the Crossgate's FOIA request with a total estimated search cost of $7,247.48.[1] This cost was prohibitively expensive for Crossgate to pay.  As such, Crossgate has yet to receive the records responsive to the FOIA, likely the same or similar as documents it seeks to complete or, alternatively, to supplement the Administrative Record in this case.

---

[1] On July 25, 2019, Crossgate sent a second FOIA request, with more specific requests for documents related to the VA's purchase of the Midlands property. On August 2, the VA determined that the records are available but must be obtained at what appears to be considerable cost. See Exh. 2, *VA Response to Second FOIA Request.*

Earlier in 2019, as required by the scheduling order in this case, Crossgate communicated with  VA Counsel to seek agreement concerning the supplementation of documents related to the Midlands Site acquisition to the Administrative Record.    The VA would not agree to supplement the record other than to add Crossgate's Comments Exhibits (provided during the NEPA process), which were erroneously excluded from the Administrative Record.  Then, pursuant to the Scheduling Order [D.N. 13], the Court held a telephonic conference to attempt to settle the dispute. That conference was unsuccessful.

Pursuant to the same Scheduling Order, Crossgate is now moving to complete or supplement the record. The requested documents are all relevant to this litigation and would assist the Court in deciding whether the VA acted arbitrarily or exceeded its authority and should be included in the record.  Because the VA purchased the Midlands property prior to completion of the NEPA process, in violation of the NEPA rule against prejudicial commitment of resources in advance of completion of NEPA analysis and documentation, the only way for the Court to verify whether the VA violated the law is to review the VA's extra-record actions undertaken during NEPA review and the decision-making process in purchasing the Midlands property on July 6, 2012.[2]

While the VA has argued that the documents were not considered by the VA during the NEPA process, the NEPA regulation speaks to prohibitions on actions occurring *outside* of the record of analysis that have a prejudicial bearing on that decisional process.  Refusal to allow such records to be submitted to this Court for review would be as prejudicial to Plaintiff's ability to demonstrate that the NEPA requirements were violated by such actions, as would be those

---

[2] See Exh. 3, *General Warranty Deed*.  Note that, at minimum, this deed should be included in the record to allow the Court to potentially take judicial notice of the date of purchase, which was years prior to any truly substantive environmental review under NEPA.

actions themselves seeking to implement a decision in advance of completion of the comparative analyses.

**FACTUAL BACKGROUND**

A determination was first made by the VA on May 7, 2004 to conduct a six-month study, through the Capital Asset Realignment for Enhanced Services ("CARES") process, to consider enhancement or replacement of the 52-year-old Robley Rex VA Medical Center on Zorn Avenue in Louisville, Kentucky VA. Officials alleged that the hospital was overcrowded, outdated, and the VA was unable to expand the current site, despite the fact that there are a significant number of acres of undeveloped land on the site. The VA, through the CARES process, recommended further studies needed to be conducted for the enhancement or replacement of the medical center. The CARES Summary Report is devoid of any environmental review considerations. In addition, all thirteen possibilities for a revamped VAMC (set out in the Summary Report) contemplated either re-use of the Zorn Avenue property or co-location of services with the University of Louisville in Downtown Louisville.  Obviously, none of these thirteen possibilities were ultimately selected.

Later that month, on May 27, 2004, an investment partnership was formed between Blue Equity, LLC and former co-developer, Fenley Real Estate. The partnership paid $4.96 million to Margaret Hildebrand and her brother, Henry, to purchase 36 acres of residential-zoned farmland near Brownsboro Road and the Watterson Expressway ("Midlands Site"). The Jefferson County Property Valuation Administrator determined the property tax assessment for the Midlands Site to be $4.96 million. In late 2004, as part of the CARES process, questionnaires were mailed to stakeholders, including veterans, veterans' family members, and VA or VAMC employees, requesting their input on a future site location for the VA replacement medical facility. The

4

veterans purportedly expressed concerns regarding traffic and parking if a new facility would be built in Downtown Louisville.

In late 2005, U.S. Representative Anne Northup imposed a deadline on the VA to make a decision regarding the site of a new hospital by June 1, 2006. Rep. Northup expressed a preference for the new VAMC to be built downtown near the University of Louisville's Medical School and Hospital, which includes the region's only Level 1 Trauma Center. The VA then began conducting public hearings in late 2005 regarding its plans to build the new VAMC or rehabilitate the existing facility at Zorn Avenue.

In June of 2006, the CARES Stage 1 Study was published, alleging a need to replace the existing VA Medical Center at Zorn Avenue. On June 30, 2006, then VA Secretary R. James Nicholson held a news conference in Louisville announcing the decision to build a new medical center to replace the existing facility. The press release announcing the decision noted that the VA would conduct the necessary due diligence for property acquisition and request congressional approval before the new facility could be built. Secretary Nicholson, Representative Anne Northup, Senator Mitch McConnell, and Representative Ron Lewis held a press conference in Louisville announcing a new facility that would break ground in two to four years. Although a site had not been selected, it was announced by Secretary Nicholson during the press conference that the location would likely be in Downtown Louisville.

In February of 2008, Louisville Metro Mayor Jerry Abramson and the University of Louisville President, James Ramsey, submitted a proposal to the VA for a downtown hospital. In March of 2009, the VA commenced a traffic study pertaining to the replacement Louisville VAMC. On April 6, 2009, the VA held a public meeting at the Clifton Center to discuss potential

site options. Several commenters, including veterans, voiced opposition to a new site location and wanted the VAMC to remain at Zorn Avenue.

In July 2009, the M. Davis and Company ("MDAC") completed a survey regarding veteran preferences for the replacement Louisville VAMC. MDAC surveyed 537 veterans served by the current Louisville VAMC to determine the preference regarding the location of a new VA medical center in Louisville, showing overwhelmingly support for the VAMC to remain at the Zorn Avenue site. In October 2009, $75 million was appropriated by Congress for real estate acquisition, master planning, design, and preliminary site development of a replacement Louisville VAMC. That same month, a feasibility study regarding the replacement of the Louisville VAMC was completed.  The feasibility study concluded that each alternative was feasible. The study did not attempt to identify any particular site, but rather evaluated a generic new site's feasibility compared to reconfiguring existing Zorn Avenue facility. In January of 2010, then VA Secretary Shinseki requested that a more comprehensive analysis be conducted for potential site options.

On April 7, 2010, the VA issued a request for available "greenfield" sites for the hospital. Secretary Shinseki gave his approval for the exploration of options outside of Downtown Louisville focusing on "greenfield" sites. Then on April 10, 2010, the VA published a press release expressing the VA's interest in procuring land for a replacement VAMC seeking proposals for a minimum of 25-acres in Jefferson County, Kentucky. Secretary Shinseki stated in his letter to U.S. Representative Coffman that the "purpose of this site selection process was to identify the Greenfield site best-qualified to serve as a potential location for the proposed VAMC." The sites were required to have a minimum of 25 acres, all but eliminating most sites

in or around Downtown Louisville, and unreasonably ignoring the option of acquiring downtown properties that could have been aggregated to meet the minimum acreage requirement.

From May 11 to May 13, 2010, a site selection survey was conducted by the VA Site Selection Board, still focusing on greenfield sites. Crossgate contends that this arbitrary decision to only consider greenfield sites eliminated all reasonable alternatives located at urban sites (including Downtown Louisville), and in doing so, the VA failed to comply with NEPA by failing to evaluate a range of reasonable alternatives including urban sites. The inadequate "range of alternatives," and the deficient environmental assessment of the two alternatives that it did assess, reflects the VA's unwavering bias toward the Midlands site as indicated by their constant and consistent public comments that the VA was considering no other site besides the Midlands site. On June 22, 2010, Senator Mitch McConnell sent a letter to Secretary Shinseki with a proposed VA timetable for completion of the VAMC. In August of 2010, Secretary Shinseki authorized a due diligence study on the top three greenfield sites, the downtown site, and the existing Zorn Avenue VAMC.

On December 10, 2010, the first appraisal was conducted on the Midlands property by Galloway Appraisals for the VA's Office of Acquisition, Logistics, and Construction ("OALC"). This first appraisal determined the value of the property to be $9.6 million: $7.5 million for the 22.3 commercial acres and $2.1 million for the 14.5 residential acres. The appraisal was not released publicly.   A second appraisal by the same appraiser, Galloway Appraisals, for OALC valued the identical property at $12.9 million on February 29, 2012. This discrepancy became the subject of the VA's later IG Report, discussed *infra.*

The VA held another public meeting on May 11, 2011 at the Clifton Center to present proposals for three greenfield sites, while still maintaining that they were considering the

downtown and Zorn Avenue sites. On August 5, 2011, Congress awarded $13 million for improvements and $10 million in upgrades for the Zorn Avenue Louisville VAMC. After repeated attempts, Senator McConnell again asked for a decision from the VA to be finalized regarding the location of the replacement Louisville VAMC. The VA responded that the decision would be made in September 2011. In a letter from Senator McConnell to Secretary Shinseki, dated October 1, 2011, the Senator requested that the VA speed up the selection process without openly showing interest in any specific site location.

On November 10, 2011, Secretary Shinseki formally announced the preferred site as the Midlands site, with the St. Joseph's site as the second preferred site. Blue Equity held a public meeting on November 17, 2011 regarding the replacement VAMC's potential location at the Midlands site.

As mentioned, *supra,* on February 29, 2012, a second appraisal was prepared for the Midlands site. This time, the property was valued at $12.9 million. This appraisal was criticized by the VA' Inspector General ("IG") both on the appraisal value of the property, the method by which the VA acquired the property, and the failure to obtain a follow-up appraisal. The IG found that "The Office of Acquisition, Logistics, and Construction did not obtain a required review appraisal for determining the appropriateness of the two appraisals prior to purchasing the land for $12,905,000. VA did obtain a review appraisal in April 2014, nearly two years after the property was purchased and at a cost of $2,447. Spending $2,447 for the review appraisal was a waste of the taxpayers' money because of the timing of the review appraisal was useless in determining whether the VA paid just compensation for the property."

In March 2012, the Draft Programmatic Environmental Analysis ("DPEA") was published. On March 10, 2012, Senator McConnell announced that Secretary Shinseki would

determine a final replacement Louisville VAMC site by Spring 2012. The Final PEA was published on June 8, 2012 with a Finding Of No Significant Impact. The FONSI for the PEA was signed on June 15, 2012. Citizens submitted comments and letters outlining the deficiencies of the PEA and demanding a full EIS, but despite these concerns, on June 10, 2012, and before the site-specific Environmental Assessment ("SEA") or the EIS were completed, and before the FONSI for the PEA was signed, the VA agreed to pay $12.9 million for the purchase of the Midlands site and, a month later, the deal was finalized. Secretary Shinseki announced the Midlands site's formal selection for the replacement Louisville VAMC.  The property was deeded to the VA on July 6, 2012.  The VA's Final EIS was not completed until 2017.

**ARGUMENT**

I.  **THE ADMINISTRATIVE RECORD IS NOT COMPLETE.**

Crossgate moves this Court to order the VA to complete the Administrative Record ("Record") for judicial review.  In the alternative, Crossgate moves to supplement the Record to include any documents relating to the acquisition of the Midlands site by the VA, including but not limited to:

1.  All documents and communications (letters, emails, etc.) related to the acquisition of the Midlands property in the possession of the VA;

2.  All documents and communications (letters, emails, etc.) related to the 2010 decision by the VA to issue a request for available "greenfield" sites for the relocation of the hospital and the decision by Secretary Shinseki to focus on "greenfield" sites outside of Downtown Louisville;

3.  All documents and communications (letters, emails, etc.) related to the acquisition or proposed acquisition of any of the other alternative properties for purposes of re-locating the replacement VAMC;

4.      Any VA Inspector General reports related to the acquisition and underlying documents associated with the VA Inspector General reports; and

5.      Any communications between U.S. Representatives/Senators (or their staff) and the VA related to the site selection of the replacement VAMC.

Crossgate requests this Court consider the above-mentioned records, which would aid the Court in determining whether the VA considered all relevant factors in its decision-making process or whether the VA had invalidly predetermined its site selection in violation of NEPA. Under NEPA, environmental review must be completed *before* resources are irreversibly and irretrievably committed to the action under review. 42 C.F.R. 4332(C); 40 C.F.R. 1501.2. The VA agreed to purchase the Midlands site on June 10, 2012, more than five years before the NEPA review process was complete. Therefore, the VA's motivations relating to the purchase of the Midlands site are in issue and should be part of the Record on judicial review. "The reviewing court shall... (2) hold unlawful and set aside agency action, findings, and conclusions found to be – (a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). As part of this analysis, it is necessary for the Court to consider the VA's prejudgment and bias from the premature acquisition of the Midlands site which was arbitrary, capricious, and contrary to law.

II.    **WHERE DOCUMENTS ARE WITHIN THE AGENCY'S FILES AND WERE DIRECTLY OR INDIRECTLY CONSIDERED BY THE AGENCY, A MOTION FOR RECORD COMPLETION SHOULD BE GRANTED.**

Judicial review of agency actions under NEPA is governed by the Administrative Procedure Act (APA). Section 706 of the APA directs a court evaluating an agency action to "review the whole record or those parts of it cited by a party." 5 U.S.C. § 706; see also Fed. R. App. P. 16(a) (the record on review of an agency order "consists of the order involved; any

findings or report on which the order is based; and the pleadings, evidence, and other parts of the proceedings before the agency").

The APA requires the reviewing court have access to the complete administrative record when assessing the legality of agency action. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971). The complete administrative record is to be based upon the entire administrative record before the agency when it made its decision and necessarily includes documents that "were directly or indirectly" considered by the agency in making its decision. *Id*. at 420. "It is a widely accepted principle of administrative law that the courts base their review of an agency's actions of the materials that were before the agency at the time its decision was made." *IMS, P.C. v. Alvarez*, 129 F.3d 618, 623 (D.C. Cir. 1997).

"[T]he record properly consists of all relevant documents before the agency at the time of the decision, not simply those that the agency relied upon in reaching its decision." *Wilderness Soc., Center for Native Ecosystems v. Wisely*, 524 F.Supp.2d 1285, 1295 (D. Colo. 2007). Additionally, "the agency cannot arbitrarily close its eyes and refuse to consider certain materials placed before it." *Ad Hoc Metals Coal v. Whitman*, 227 F. Supp. 134, 139 (D.C. Cir. 2002). A document created by the agency or located within the agency's files are considered "before the agency" and are necessarily a part of the administrative record. *See Cnty. Of San Miguel v. Kempthorne*, 587 F. Supp. 2d 64, 76 (D.C. Cir. 2008) ("It is axiomatic that documents created by an agency itself or otherwise located in its files were before it.").

Here, the underlying motivations for the Midlands site selection and acquisition were in issue long before the Record of Decision was entered by the VA regarding a replacement Robley Rex VA Center. These motivations were raised again by Crossgate in its Comments regarding the Draft EIS submitted on January 11, 2017. The records surrounding the acquisition of the

Midlands site were either directly or indirectly considered by the Agency as the materials likely consist of internal communications between VA officials relating to site selection, the 2010 directive by Secretary Shinseki to focus on "greenfield sites" away from Downtown Louisville, the decision to purchase the Midlands site in 2012, and the lack of consideration of alternative sites. The agency had direct knowledge that it acquired the Midlands site prior to completing the NEPA process. This premature acquisition resulted in prejudgment and bias by the VA which violated NEPA, CEQ's implementing regulations [*see* 40 C.F.R. 1506.1 ("While work on a required program environmental impact statement is in progress and the action is not covered by an existing program statement, agencies shall not undertake in the interim any major Federal action covered by the program which may significantly affect the quality of the human environment unless such action...[w]ill not prejudice the ultimate decision on the program. Interim action prejudices the ultimate decision on the program when it tends to determine subsequent development or limit alternatives.")] and the VA's own NEPA implementing regulations [*see* 38 C.F.R. 26.7 ("The major decision points for VA actions, by which time the necessary environmental documents must be completed, are as follows...(6) Land acquisition for development.")].

Therefore, because the complete administrative record is to be based upon the entire administrative record before the agency when it made its decision, this must include documents that "were directly or indirectly" considered by the agency in making its decision. Any records relating to the acquisition of the Midlands site as well as any overt prejudices which thereafter limited the possibility of alternatives sites should be a part of the Administrative Record for this Court to review.

**III.** **IN THE ALTERNATIVE, THIS COURT SHOULD SUPPLEMENT THE ADMINISTRATIVE RECORD TO INCLUDE RECORDS RELATING TO ACQUISITION OF THE MIDLANDS SITE BECAUSE IT PROVIDES ESSENTIAL BACKGROUND INFORMATION THAT IS NECESSARY FOR THE COURT TO EVALUATE CROSSGATE'S CLAIMS.**

If the Court finds that the Record was complete, the Crossgate hereby moves to supplement the Record to add the same requested documents. Where an agency deliberately or negligently fails to include certain documents in the record filed with the court, supplementation of the administrative record is justified. *Latin Ams. For Soc. & Econ. Dev. v. Adm'r of the Fed. Highway Admin.*, 756 F.3d 447, 465 (6th Cir. 2014) (citing *Sierra Club v. Slater*, 120 F.3d 623, 638 (6th Cir. 1997)). A reviewing court may take into consideration supplementary documentation outside of the administrative record to assess the adequacy of the agency's decision. *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1427 (6th Cir. 1991). Documents "may be added to the administrative record where denying the documents' relevant 'would be inconsistent with rational decisionmaking by an administrative agency.'" *Silver State Land, LLC v. Beaudreau*, 59 F. Supp. 3d 158, 170 (D.C. Cir. 2014) (citing *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 244 (D.C. Cir. 2008) (quoting *Kent County, Del. Levy Court v. EPA*, 963 F.2d 391, 396 (D.C. Cir. 1992)). Where additional evidence outside the record would provide the court with certain background information or would assist the court in determining whether the agency considered all relevant factors, a court may consider additional evidence. *Akzo*, 949 F.2d at 1428.

The "reviewing court must conduct a substantial inquiry, and determine whether the Secretary acted within the scope of his authority, whether his decision was within the small range of available choices, and whether he could have reasonably believed that there were no feasible alternatives." *Volpe*, *supra* at 403. In this Court's review of the Secretary's decision, it can admit supplementary evidence which is necessary to aid in the explanation of the record or the ultimate

13

decision "since the bare record may not disclose the factors that were considered or the Secretary's construction of the evidence it may be necessary for the District Court to require some explanation in order to determine if the Secretary acted within the scope of his authority or if the Secretary's action was justifiable under the applicable standard." *Id*. at 420. If "further explanation is necessary to a proper assessment of the agency's decision" then supplementing the record is warranted. *Camp v. Pitts*, 411 U.S. 138, 143 (1973). If the Court wishes to make formal findings, it can also choose to take testimony from the Secretary or other administrative officials so that those officials may explain their actions. *Volpe* at 420.

Such is the case here. The requested documents, including the internal communications between VA officials relating to site selection, the 2010 directive by Secretary Shinseki to focus on "greenfield sites" away from Downtown Louisville, the decision to purchase the Midlands site in 2012, and the lack of consideration of alternative sites, is necessary to ascertain whether the VA pre-determined that the new VAMC would be built at the Midlands site, purchased five years before completion of its environmental analysis. The supplemental evidence may also show evidence of the agency's unjustified bias towards "greenfield sites." It is critical that this Court assess whether the VA's purchase of the Midlands property violated NEPA. Such an assessment is impossible without consideration of these underlying records.

As previously discussed, the administrative record in existence at the time of the agency decision does not always depict the complete picture behind the agency's decision, and there are myriad federal NEPA cases where extra-record evidence has been considered on judicial review.

> It could happen that a particular instance of judicial review of an EIS raises a 'genuine' and 'material' dispute of facts that requires a trial: Did the agency *know*, for example, about some important matter that the EIS ignored (and which the commenting parties did not know about and could not have pointed out?). *See Friends of the Earth v. Hintz*, 800 F.2d 822, 829 (9th Cir. 1986); *County of Suffolk v. Secretary of Interior*, 562 F.2d 1368, 1384-85 (2d Cir. 1977), *cert. denied*, 434

14

> U.S. 1064 (1978). Or, did the agency improperly rely upon some other important,
> but secret, information not part of the record? *Friends of the Earth v. Hintz*, *supra*.
> Moreover, a reviewing court might want additional testimony by experts, simply
> to help it understand matters in the agency record; indeed, it might ask for
> additional factual evidence as an aid to understanding. However desirable this
> kind of evidentiary supplementation as an aid to understanding highly technical,
> environmental matters, its use is discretionary with the reviewing court. *Love v.
> Thomas*, 858 F.2d 1347 (9th Cir. 1988), *cert. denied*, 490 U.S. 1035 (1989);
> *Asarco, Inc. v. U.S.E.P.A.*, 616 F.2d 1153 (9th Cir. 1980).

*Valley of Citizens for a Safe Environment v. Aldridge*, 886 F.2d 458, 460 (1st Cir. 1989). In this

case, the Court must ask – did the VA improperly rely on "some other important, but secret,

information not part of the record?"[3] Even with what little evidence is known on the acquisition

of the site, Crossgate maintains that the VA acted unlawfully by arbitrarily foregoing a complete

NEPA review and allowing the immediate purchase of the Midlands property in 2012, revealing

its express bias toward the site and tainting the remainder of the regulatory project review.

In instances where the agency may have acted in bad faith, the court's consideration of

extra-record evidence is imperative to achieving meaningful judicial review. In these cases,

Petitioner must make a "strong showing of bad faith or improper behavior." *Citizens for

Alternatives to Radioactive Dumping v. U.S. Dept. of Energy*, 485 F.3d 1091, 1096 (10th Cir.

2007). There is evidence in the existing record that the VA's Inspector General found that the

VA failed to obtain a follow-up appraisal, likely overpaid for the Midlands site by $3 million, as

well as evidence that the VA purchased the Midlands site years before the NEPA process was

complete, effectively eliminating all other alternative site plans from consideration. Where there

is smoke, there is fire. If the Court peeks behind the veil, and examines the extra-record

evidence, we believe it is likely to find even more evidence of bias and predetermination in the

VA's Midlands site selection, finding the VA's decision arbitrary, capricious, and contrary to

law.

---

[3] *See Friends of the Earth v. Hintz*, 800 F.2d 822, 829 (9th Cir. 1986)

Several circuits have applied an "initial examination" approach of the extra-record evidence to determine whether circumstances exist for granting a motion to supplement which may aid in determining whether the agency "failed adequately to discuss some reasonable alternative, or otherwise swept stubborn problems or serious criticism...under the rug." *Lee v. U.S. Air Force*, 354 F.3d 1229, 1242 (10th Cir. 2004). This Court should undergo an initial examination of the requested records so that it may weigh its probative value in determining agency arbitrariness.

In *Forest Guardians v. U.S. Fish and Wildlife Service,*[4] the Court held that it must consider extra-record evidence in order to determine whether the agency had predetermined the outcome of its NEPA analysis and "irreversibly and irretrievably committed itself to a course of action" but where the "bias is not obvious from the face of the environmental analysis itself." *Id*. at 717. In these situations, the Court must not "ignore relevant evidence that suggests that the agency may have violated the procedures established by NEPA, thereby contravening the statute's overarching purpose." *Id*. The Sixth Circuit has adopted a similar approach from what was articulated in the Tenth Circuit's *Forest Guardian* finding that the Petitioner must prove predetermination by showing that an agency "irreversibly and irretrievably commit[ted] itself to a plan of action that is dependent upon the NEPA environmental analysis producing a certain outcome, *before* the agency has completed that environmental analysis – which of course is supposed to involve an objective, good faith inquiry into the environmental consequences of the agency's proposed action." *Tennessee Env'l Council v. Tennessee Valley Authority*, 32 F.Supp.3d 876, 884 (6th Cir. 2014) *citing Forest Guardians* at 712.

The Sixth Circuit found that the inquiry must be "whether [the agency] has gone too far in [focusing on its preferred alternative], reaching the point where it actually has 'limited the

---

[4] 611 F.3d 692 (10th Cir. 2010).

choice of reasonable alternatives.'" *Id. citing Nat'l Audubon Soc'y v. Dep't of the Navy*, 422 F.3d

174, 206 (4th Circ. 2005). Under this line of cases, taking minor steps towards a preferred

agency action is proper, but outright purchasing the Midlands property limited the scope of

reasonable alternative sites that the VA was considering and unlawfully committed the VA to

that plan prior to the completion of the NEPA analysis in violation of NEPA and the VA's own

NEPA implementing regulations. Accordingly, the Court should consider the requested

documents as extra-record evidence.

### CONCLUSION

For the reasons stated above, Crossgate respectfully requests the Court grant this Motion,

and require the requested documents be made part of the Administrative Record.

Respectfully submitted,

/s/ Clay A. Barkley
RANDAL A. STROBO, KBA #92767
CLAY A. BARKLEY, KBA #93635
STROBO BARKLEY PLLC
239 South Fifth Street, Suite 917
Louisville, Kentucky 40202
(502) 290-9751
(502) 378-5395 (fax)
rstrobo@strobobarkley.com
cbarkley@strobobarkley.com
*Co-Counsel for Plaintiffs*

THOMAS J. FITZGERALD, KBA #22370
Kentucky Resources Council, Inc.
213 St. Clair Street
Frankfort, KY 40601
(502) 875-2428
fitzkrc@aol.com
*Co-Counsel for Plaintiffs*

17

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served by ECF, which will send a notice of electronic filing to all counsel of record in the above captioned action on this 9th day of August, 2019.

/s/ Clay A. Barkley