UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

CITY OF CROSSGATE,            )
                             )
        Plaintiff,           )         Civil Action No. 3:18-cv-167-CHB
                             )
v.                           )
                             )         **MEMORANDUM OPINION AND
U.S. DEPARTMENT OF VETERANS  )         ORDER GRANTING DEFENDANTS'
AFFAIRS, et al.,             )         MOTION FOR SUMMARY
                             )         JUDGMENT**
        Defendants.          )

                    ***   ***   ***   ***

        This matter is before the Court on the parties' cross-motions for summary judgment. [R.

33, 37] Various responses and replies were filed. [R. 36, 40, 41, 42] For the reasons explained

below, the Court grants Defendant United States Department of Veterans Affairs' Cross-Motion

for Summary Judgment. [R. 37]

**I.  Background**

        The U.S. Department of Veterans Affairs (VA) operates a medical center, located on

Zorn Avenue in Louisville, Kentucky. Between 1998 and 2004, the VA completed a nationwide

assessment of its facilities and identified the Louisville medical center as one that needed to be

replaced due to the projection that the medical center would not have enough space to meet the

future health care needs of the region's veterans. [R. 36 at 3-4; VA-00818[1]] In 2009, the VA

conducted a feasibility study to consider reconfiguration options for the existing medical center

but concluded that a new medical center at a different location would ultimately best meet future

needs. [VA-04317] Specifically, the VA "concluded that a full replacement hospital on a

---

[1] Citations to the record correspond to the appendices filed by Plaintiff in support of its Motion for Summary
Judgment via DVD identified on the docket at R. 34 and R. 35.

greenfield (previously undeveloped) site would likely be least expensive, fastest to delivery, and [have] the least adverse impact on ongoing Veteran access to care and services." [VA-04326] The VA began the long process of finding available property that could eventually serve as the location of a newly constructed replacement medical center. [VA-04327] After receiving offers and screening the options based on various criteria, the VA identified four potential locations, referred to as the Brownsboro site, the St. Joseph site, the Fegenbush site, and the downtown site,[2] as well as continuing to consider the option to reconfigure the existing medical center. [VA-04327] In 2011, the VA began its environmental review process under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2)(C), a process that will be discussed in greater detail below, and in 2017 made the final decision that the new VA medical center would be constructed on the Brownsboro site. [VA-30606]

Next door to the Brownsboro site is the City of Crossgate. [R. 1 at 3] It is comprised of about 100 single family homes and around 240 citizens. [*Id.*] Crossgate did not take well to the VA's plans to construct a new medical center, with approximately 1,000,000 square feet of building space in an adjacent field, without completing a "full and adequate review of the environmental impact" the project would have, as required by NEPA. Therefore, Crossgate sued under NEPA and the Administrative Procedure Act (APA), 5 U.S.C. § 706, seeking a declaratory judgment and injunctive relief requiring the VA to comply with NEPA and prohibit any construction until the VA has done so. [R. 1] Crossgate and the VA ultimately filed cross-motions for summary judgment on the APA and NEPA claims, based on the administrative record before the Court.

---

[2] The Brownsboro, St. Joseph, and Fegenbush sites were all "greenfield" sites and the downtown site was an urban site offered by the University of Louisville and the City of Louisville. [VA-04327]

2

## II.  Standard

"Summary judgment is proper if the record shows that no genuine dispute exists as to any material fact, and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Kentucky Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402, 407 (6th Cir. 2013). Additionally, a federal agency's compliance with NEPA is reviewed under the Administrative Procedure Act's arbitrary and capricious standard. *Friends of Tims Ford v. Tennessee Valley Authority*, 585 F.3d 955, 967 n. 3 (6th Cir. 2009) ("NEPA does not authorize a private right of action but judicial review is granted through the APA" (citations omitted)); *Save Our Cumberland Mountains v. Kempthorne*, 453 F.3d 334, 339 (6th Cir. 2006) ("When faced with a lawsuit under [NEPA], a federal court has authority to review the agency's action under the [APA]"). The APA directs courts to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency's decision is arbitrary and capricious when the agency has:

> relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife,* 551 U.S. 644, 658 (2007).

Therefore, [j]udicial review of NEPA compliance is limited in scope." *Kentucky Riverkeeper*, 714 F.3d at 407 (quoting *Cmtys., Inc. v. Busey*, 956 F.2d 619, 623 (6th Cir. 1992)). Federal agencies have "considerable discretion" in carrying out NEPA obligations and judicial review is through a "deferential lens"—the arbitrary and capricious standard. *Klein v. U.S. Dep't of Energy*, 753 F.3d 576, 580 (6th Cir. 2014). This involves a "searching and careful" review that asks "whether the agency adequately studied the issue and took a hard look at the environmental consequences of its decision, not whether the agency correctly assessed the proposal's

3

environmental impacts." *Id.* (quoting *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989*)* and *Save Our Cumberland Mountains*, 453 F.3d at 339). And while an agency must take a "hard look," it is "equally well established" that the "hard look" requirement is "tempered by a practical 'rule of reason.'" *Mason Cty. Med. Ass'n v. Knebel*, 563 F.2d 256, 264 (6th Cir. 1977); *Kentuckians for the Commonwealth v. U.S. Army Corps of Engineers*, 746 F.3d 698, 710 (6th Cir. 2014).

### III. The National Environmental Policy Act

The National Environmental Policy Act (NEPA) was "enacted to promote efforts by federal agencies to prevent damage to the environment and advance human health and welfare." *Latin Americans for Soc. & Econ. Dev. v. Adm'r of Fed. Highway Admin.*, 756 F.3d 447, 462 (6th Cir. 2014); 42 U.S.C. § 4321. It requires federal agencies planning "major Federal actions significantly affecting the quality of the human environment" to consider the environmental effects of its action and alternatives to the proposed action. 42 U.S.C. § 4332(2)(C). NEPA also established the Council on Environmental Quality (CEQ), 42 U.S.C. § 4321, which issues mandatory regulations for the implementation of the procedural provisions of NEPA. *Andrus v. Sierra Club*, 442 U.S. 347, 357 (1979). CEQ's regulations and interpretation of NEPA is "entitled to substantial deference." *Id.* at 358; *Kentucky Riverkeeper*, 714 F.3d at 407 (courts "give 'substantial deference' to the regulations promulgated by the [CEQ], the federal agency established to fill in the gaps of NEPA's regulatory scheme."). Under NEPA "[t]he role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97–98 (1983).

NEPA employs a "set of 'action-forcing' procedures that require agencies to take a 'hard look at environmental consequences.'" *Kentucky Riverkeeper*, 714 F.3d at 407. Although NEPA and its implementing regulations impose various requirements on federal agencies' decision-making, it does not require a particular result. *Save Our Cumberland Mountains*, 453 F.3d at 338. NEPA "serves procedural rather than substantive goals. It does not require agencies to 'achieve particular substantive environmental results,' but requires them to 'collect and disseminate information about the environmental consequences of proposed actions that fall under their respective jurisdictions.'" *Id.* (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989) and *Sw. Williamson Cty. Cmty. Ass'n, Inc. v. Slater*, 243 F.3d 270, 278 (6th Cir. 2001)); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).[3] Thus, NEPA's requirements are meant to simply "integrate environmental concerns into the very process of agency decisionmaking." *Save Our Cumberland Mountains*, 453 F.3d at 338 (cleaned up) (quoting *Andrus*, 442 U.S. at 350).

To ensure an agency takes the required "hard look" at the environmental consequences of its actions, NEPA requires federal agencies to prepare a "detailed statement" called an "environmental impact statement" (EIS) for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C); *Kentucky Riverkeeper*, 714 F.3d at 407.  However, "[t]o spare agencies the hardship of conducting exhaustive review of every [federal] proposal's environmental impact, [the] CEQ authorized agencies to first prepare a less burdensome environmental assessment as a method for determining whether a proposal needed an environmental impact statement." *Kentucky Riverkeeper*, 714 F.3d at 407–08; 40 C.F.R. §

---

[3] "The purpose and function of NEPA is satisfied if Federal agencies have considered relevant environmental information, and the public has been informed regarding the decision-making process. NEPA does not mandate particular results or substantive outcomes. NEPA's purpose is not to generate paperwork or litigation, but to provide for informed decision making and foster excellent action." 40 C.F.R. § 1500.1(a) (2020).

1508.9.[4] Thus, two types of NEPA documents are the "environmental impact statement" (EIS) and the "environmental assessment" (EA).

An "environmental assessment" (EA) is a less detailed "concise public document . . . that serves to . . . [b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9; *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757–58 (2004) ("The CEQ regulations allow an agency to prepare a more limited document, an Environmental Assessment . . ."); *Kentuckians for the Commonwealth v. U.S. Army Corps of Engineers*, 746 F.3d 698, 703 (6th Cir. 2014). Thus, an agency can "first prepare an [EA] in order to determine whether the project's effect on the environment will be significant enough to warrant a more detailed [EIS]." *Sierra Club v. Slater*, 120 F.3d 623, 635 (6th Cir. 1997). Further, "[a]gencies may prepare an environmental assessment on any action at any time in order to assist agency planning and decisionmaking." 40 C.F.R. § 1501.3(b). If the agency prepares an EA and determines that its proposed action will not have a "significant impact" on the environment, then it prepares a "finding of no significant impact," or FONSI, and the preparation of an EIS becomes unnecessary. *Sierra Club*, 120 F.3d at 635. A FONSI briefly presents the reasons why an agency action will not create a significant environmental impact and why an EIS will not be issued. 40 C.F.R. § 1508.13. Alternatively, an agency may determine, based on its EA, that it needs to prepare the more detailed EIS. 40 C.F.R. § 1501.4(c).  A federal agency has "considerable

---

[4] In 2017, President Trump issued an executive order instructing the CEQ to "modernize" NEPA regulations. Exec. Order No. 13807, 82 Fed. Reg. 40,463 (Aug. 15, 2017). In 2020, the CEQ completed that process, establishing new NEPA regulations with an effective date of September 14, 2020. 85 Fed. Reg. 43304-01; 40 C.F.R § 1506.13. Because the VA applied the previous regulations to its NEPA process, the Court will do so as well. *See, e.g. Bair v. California Dep't of Transportation*, 982 F.3d 569, 577 (9th Cir. 2020) (noting CEQ's adoption of new regulations but applying the previous version used by defendant to its project); 40 C.F.R. § 1506.13 (stating the new regulations "apply to any NEPA process begun after September 14, 2020."). All citations to NEPA regulations, unless otherwise noted, refer to the pre-2020 amended regulations.

discretion in determining whether an environmental assessment should lead to an [EIS]." *Kentucky Coal Ass'n, Inc. v. Tennessee Valley Auth.*, 804 F.3d 799, 804 (6th Cir. 2015) (internal quotations omitted). And courts review the decision not to prepare one under the "arbitrary and capricious" standard. *Id.* (citing *Pub. Citizen*, 541 U.S. at 763). At the conclusion of its NEPA analysis, the agency issues a "concise public record of decision" (ROD), 40 C.F.R. § 1505.2, and until it issues a ROD, the agency cannot take any "action concerning the proposal" that would "[h]ave an adverse environmental impact" or "[l]imit the choice of reasonable alternatives" available to the agency. 40 C.F.R. § 1506.1(a)(1)-(2).

## IV. Analysis

The VA began its environmental review process under NEPA by first producing a programmatic environmental assessment (PEA). [VA-00798] The PEA's purpose was to "evaluate[] the potential environmental effects of the [VA's] Proposed Action to select and acquire a site for the construction and operation of a . . . replacement VA Medical Center." [VA-00799] Further, it stated that once a location was selected the "VA would prepare a subsequent, tiered, Site-specific EA (SEA) to more precisely analyze and evaluate the potential effects of the construction and operation of the proposed [medical center]." [*Id.*] The PEA outlined the purpose and need of the proposed action, discussed the alternative sites that could potentially serve as the new location (Brownsboro and St. Joseph), as well as a "no action" alternative to "provide a comparative baseline against which to analyze the effects of the Proposed Action." [VA-00798] It identified a "preferred" site (Brownsboro), described the environmental impacts that would potentially occur if either location were selected, and concluded with a "mitigated" finding of no significant impact (FONSI), stating that there would be less-than-significant effects on the environment if "the mitigation measures and best management practices (BMPs) identified in

this PEA are implemented." [*Id.*] It also specifically delayed evaluating "site-specific impacts" to a subsequent "tiered" EA that would be produced after the new site had been selected, acquired, and the design process had begun. [*Id.*]

After the final PEA was published, the VA purchased the Brownsboro site on July 10, 2012 and proceeded to conduct a site-specific environmental assessment (SEA) on the Brownsboro site. [VA-01812] The draft SEA noted that the 2012 PEA found no significant impact in selecting the Brownsboro site for the location of the medical center and that this SEA would analyze two alternatives: constructing and operating a medical center on the Brownsboro site or "no action" and continuing operations on Zorn Avenue. [*Id.*] The draft SEA was released in 2014 for public comment and the VA subsequently concluded that the medical center project *did* pose a potential for significant environmental impacts. [VA-04319] Therefore, the VA began producing an EIS [VA-24820] The EIS evaluated three alternatives: build at the Brownsboro site; build at the St. Joseph site; or continue operating from the existing location on Zorn Avenue (i.e., no action). Again, the VA identified its preferred alternative—the Brownsboro site which it now owned—and conducted a comprehensive and detailed analysis of potential impacts on the environment and mitigation measures that could decrease the various impacts. [*Id.*] After publishing the final EIS, the VA published its record of decision (ROD) selecting the Brownsboro site for construction of the new medical center. [VA-24790]

Crossgate makes numerous arguments as to how the VA's final EIS and ROD violated NEPA and the APA. Notably, Crossgate does not meaningful identify any significant environmental impact that the VA may have overlooked or otherwise failed to analyze or dispute the substantive findings of the NEPA review. Rather, Crossgate first argues that the VA improperly tiered its NEPA documents by starting with a programmatic EA rather than an EIS,

which Crossgate contends is the only document permissible to serve as a foundation from which

other documents may tier from. [R. 33-1 at 7-10] Second, in a related argument, Crossgate

argues that the tiering was improper because it started with a "programmatic" EA that, according

to Crossgate, was too narrow in scope to be truly programmatic, and tiered to an equally narrow

EIS. [*Id.* at 10-13] Third, Crossgate argues that the VA's purchase of the Brownsboro site prior

to completing its EIS and issuing a ROD violated NEPA, the CEQ regulations, and the VA's

own regulations implementing its NEPA obligations. [*Id.* at 13-18] Fourth, that the VA

arbitrarily limited its review of reasonable alternatives and failed to evaluate all reasonable

alternatives to its proposed action. [*Id.* at 18-21] Fifth, that the VA failed to prepare supplemental

analysis when significant new circumstances or information arose relevant to the environmental

impact of its proposed action. [Id. at 21-23] And last, that the VA failed to conduct an adequate

"environmental justice" analysis as required by executive order. [*Id.* at 24-25] The Court will

address each of these in turn.

### A. Tiering from a programmatic EA

NEPA permits agencies to "tier" their NEPA documents, which is a process by which the

agency may incorporate by reference general discussions contained in an earlier document and

concentrate solely on the issues specific to the subsequent analysis. 40 C.F.R. §§ 1508.28,

1502.20; *Oak Ridge Env't Peace All. v. Perry*, 412 F. Supp. 3d 786, 832 (E.D. Tenn. 2019)

(citing *Guidance Regarding NEPA Regulations*, 48 Fed. Reg. 34263, 34267-68 (1983)). An

agency may tier by scope (e.g., from a programmatic to a site-specific statement), § 1508.28(a),

or it may tier by stages (e.g., from the "need" or "site selection" stage to later stages such as

mitigation). § 1508.28(b). Agencies are "encouraged to tier their environmental impact

statements to eliminate repetitive discussion of the same issues and to focus on the actual issues

ripe for decision at each level of environmental review." § 1502.20. Thus, tiering often goes from "general matters" to "subsequent narrower statements or environmental analyses" and incorporates by reference, rather than repeating, the general analysis. § 1508.28; *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 444 F. Supp. 3d 832, 847 (S.D. Ohio 2020).

Crossgate's first argument is that the "VA improperly sought to engage in tiering by using an unauthorized and insufficient environmental document as its starting point." [R. 33-1 at 7] In other words, the VA cannot tier from a PEA; rather, the foundational document to tier from is "exclusively an EIS." [*Id.* at 9] Crossgate supports this argument mainly by reference to the regulations that define tiering, which state "[t]iering refers to the coverage of general matters in broader *environmental impact statements* . . . [to] subsequent narrower statements or environmental analyses." 40 C.F.R. § 1508.28. Therefore, Crossgate contends that tiering starts with an EIS (and only an EIS) and moves to subsequent narrower statements or analyses. The regulatory language suggests that, at a minimum, tiering is appropriate from an EIS to narrower EISs or EAs. But according to Crossgate, the VA got it all wrong by starting with a programmatic EA—rather than an EIS—and then tiered from that "unauthorized environmental document." [R. 33-1 at 11]

The VA advances several arguments in response. It concedes that the tiering regulations do not specifically mention tiering from EAs but contends that the regulations also do not *prohibit* it or state that tiering from an EIS is the exclusive manner to tier. [R. 36 at 16] Additionally, under the regulations an EA is an acceptable first analysis to undertake to determine whether there are "significant" impacts such that an EIS is required. [*Id.*] *Sierra Club*, 120 F.3d at 635 (an agency may "first prepare an [EA] in order to determine whether the project's effect on the environment will be significant enough to warrant a more detailed

10

[EIS]."). Thus, the arguments goes, because tiering in general is permitted "to eliminate repetitive discussion of the same issues and to focus on the actual issues ripe for decision at each level of environmental review," § 1502.20, and an EA is permitted as an initial level of review, then it makes "logical sense" that an agency could tier from an EA. [R. 36 at 16]

Further, the VA argues that in some cases courts have looked to EIS regulations when discussing EAs, thus the regulations on tiering EISs can apply to EAs as well.[5] Lastly, the VA points to *National Trust for Historic Preservation in the United States v. United States Department of Veterans Affairs*, No. 09-5460, 2010 WL 1416729 (E.D. La. Mar. 31, 2010) ("*National Trust*") as a "highly analogous case" where the district court, according to the VA, "rejected the precise argument Plaintiffs advance here and approved of the use of a tiered EA in the environmental review for a VA hospital." [R. 36 at 16-17]

The NEPA review process in *National Trust* and the present case are quite similar. In *National Trust* the VA was attempting to relocate its medical center to a new site, rather than attempt to restore the damaged building. *National Trust*, 2010 WL 1416729 at *2. Working jointly with FEMA, the VA completed a "tiered NEPA analysis" that proceeded in two stages. *Id*. The first tier consisted of a Programmatic Environmental Assessment (PEA) that evaluated "site selection, acquisition and site preparation," and the second tier narrowed the analysis in a subsequent EA, evaluating site-specific "design, construction and operation." *Id.* The plaintiff

---

[5] For example, the VA notes that in *Kentucky Coal Ass'n, Inc. v. Tennessee Valley Auth.*, 68 F. Supp. 3d 703, 713 (W.D. Ky. Feb. 3, 2015) this Court looked to 40 C.F.R. § 1508.25 (a regulation that exclusively discusses EISs) to determine "the contents of an EA or an EIS." Similarly, in *Burkholder v. Peters*, 58 F. App'x 94, 101 (6th Cir. 2003) the Sixth Circuit appears to have looked to 40 C.F.R. § 1502.14(a) in evaluating the agency's EA even though § 1502.14's plain language pertains only to EISs. Because neither of these regulations are directly applicable to the parties' argument, the Court declines to adopt the VA's suggested principle that, in effect, EIS and EA are interchangeable throughout the NEPA regulations when they are clearly distinct types of documents requiring a different degree of analysis.

there argued "that because the agencies have not prepared an EIS, the predicate for an agency to engage in tiering under CEQ regulations, the tiering is unlawful." *Id.* at *21. The plaintiff contrasted the VA's process with tiering in other cases that "involved an EA . . . tiered to a previously existing EIS." *Id.* The district court rejected the plaintiff's arguments and concluded that the VA's tiering was appropriate and that "[a]gencies have discretion to tier the analysis of a general, broader NEPA assessment to a more narrow analysis relevant to a specific aspect of that assessment." *Id.* at *22. Ultimately, the district court deferred to the VA's decision on how to tier its NEPA documents. *Id.* at *22-23. The court explained that it "must not substitute its judgment for that of the agency, and it must avoid placing extreme or unrealistic burdens on the compiling agency . . . [b]ecause the analysis of the relevant documents requires a high level of technical expertise, courts must defer to the information discretion of the responsible federal agencies." *Id.* (quoting *Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 175 (5th Cir. 2000) (cleaned up)). Therefore, applying the "rule of reason," the district court held that "the agencies' use of tiering in the present matter does not rise to the level of arbitrary and capricious." *Id.* at *23.

In its response, Crossgate points out various factual differences between *National Trust* and the present case. [R. 40 at 5-7] But none of the factual distinctions support Crossgate's central argument that the regulations permit *only* an EIS to serve as the foundational document from which to tier subsequent NEPA documents. Crossgate does not suggest that any factual scenario, even the one in *National Trust*, permits the method of tiering that occurred. Rather, Crossgate admits that *National Trust* "suggests an alternative framework" for tiering but insists that it "is not supported by the plain language of the CEQ's administrative regulation." [*Id.* at 7]

Most tiering cases in the Sixth Circuit and throughout the country involve tiering from an EIS to a narrower EA or EIS. However, starting with an EA and tiering to a site-specific EIS is

not unheard of. In *Park County Resource Council, Inc. v. U.S. Dep't of Agriculture*, 817 F.2d
609 (10th Cir. 1987) [6] the Tenth Circuit approved a federal agency's "tiered approach to
environmental review" to issuing oil and gas leases that began with an "extensive environmental
assessment" that examined alternatives, mitigation measures, and the potential effects the
proposed activity would have on the environment. *Id.* at 612. The EA concluded with a finding
of no significant impact (FONSI) and specifically noted that before any activity that would
impact the environment (i.e., drilling and "surface-disturbing actions"), "the need for a site-
specific, much more comprehensive EIS must be examined." *Id.* at 612. The Tenth Circuit found
the agency's process to be reasonable. *Id.* at 624. The agency could use an EA with a FONSI as
tier 1 for what was "essentially a paper transaction" (issuing a lease) and then tier to a site-
specific EIS once the agency had a "concrete" proposal with more details, such as on what site
the drilling would take place. *Id.* Therefore, *Park County* suggests that, at least in some
circumstances and contrary to Crossgate's argument, an EA with a FONSI may serve as the first
tier to a later site-specific EIS.

This conclusion is further supported by other federal agency's regulations implementing
the agency's NEPA obligations, such as the TVA's, 18 C.F.R. § 1318.503(b) ("A programmatic
EA . . . can provide the foundation for the efficient review of specific tiered implementing
actions"), and the National Aeronautics and Space Administration's, 14 C.F.R. § 1216.307
("Programmatic NEPA analyses may take place in the form of an EA or EIS. These documents
allow 'tiering' of NEPA documentation for subsequent or specific actions."). The TVA and
NASA regulations are authorized by the CEQ regulations and are developed in "consultation"
with the CEQ, "adopted only after an opportunity for public review and after review by the

---

[6] *Overruled on other grounds by Vill. of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir. 1992).

[CEQ] for conformity with [NEPA] and [the CEQ] regulations," and reviewed periodically to "ensure full compliance with the purposes and provisions of [NEPA]." 40 C.F.R. § 1507.3. These other agency's regulations, approved by the CEQ, indicate that the CEQ has interpreted NEPA and its own regulations to permit a programmatic EA to "provide the foundation" for a tiered review. *See, e.g., Andrus*, 442 U.S. at 358 (CEQ's regulations and interpretation of NEPA are "entitled to substantial deference.").

Further, the VA's interpretation is consistent with the CEQ's final guidance on *Effective Use of Programmatic NEPA Reviews* (Dec. 18, 2014).[7] Although the CEQ's final guidance is advisory and not binding, it is still a persuasive interpretation of the CEQ regulations.[8] The 2014 final guidance states that the "CEQ interprets its regulations as allowing for the use of a programmatic approach in developing an EA as well as in an EIS." 79 Fed. Reg. 76987, 2014 WL 7247233. Further,

> An agency may prepare a [programmatic environmental assessment] to determine whether an EIS is required at the programmatic level or when considering a proposal that does not have significant impacts at the programmatic level. A PEA may lead to a programmatic level finding of no significant impact (FONSI) or to a determination that a PEIS is required. Following a PEA that results in a FONSI, an agency may tier to a subsequent PEA that results in a [FONSI], or may tier to a PEIS when a subsequent site- or project- specific proposal has the potential for a significant impact on the environment.

*Final Guidance for Effective Use of Programmatic NEPA Reviews* (Dec. 23, 2014), 79 Fed. Reg. 76986-01, 2014 WL 7247233.

---

[7] Available at https://ceq.doe.gov/docs/ceq-regulations-and-guidance/Effective_Use_of_Programmatic_NEPA_Reviews_Final_Dec2014_searchable.pdf.

[8] *Kentucky Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402, 408 (6th Cir. 2013) (agreeing with Ninth Circuit's "adoption" of CEQ advisory guidance's interpretation of a NEPA regulation); *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1260 (10th Cir. 2011) (explaining relevant CEQ guidance is "persuasive authority offering interpretive guidance regarding the meaning of NEPA and the implementing regulations.") (internal quotations omitted); *San Juan Citizens All. v. United States Bureau of Land Mgmt.*, 326 F. Supp. 3d 1227, 1243 (D.N.M. 2018) (citing CEQ final guidance "for its persuasive value only," noting that it is not binding, not a rule or regulation, and not legally enforceable in its own right).

Thus, "[f]ollowing a PEA that results in a FONSI an agency . . . may tier to a PEIS when a subsequent site- or project- specific proposal has the potential for a significant impact on the environment." *Id.* This is similar to what the VA did here. It prepared a PEA with a FONSI and subsequently tiered to a site-specific EIS because the site-specific proposal (to build and operate on the Brownsboro site) had the potential for a significant environmental impact. The CEQ clearly interpreted its own regulations to permit what Crossgate insists is prohibited. Considering *National Trust*, *Park County*, other agency's NEPA-related regulations, and the CEQ's 2014 final guidance,[9] the Court cannot conclude that the VA's interpretation of the tiering regulations was arbitrary or capricious.

Further, although the Court rejects Crossgate's argument based on the case law, regulations, and final guidance cited, the Court also notes that the current CEQ regulations, as amended in 2020, fully support the VA's interpretation. The regulations now explicitly permit tiering from an EA.

> Tiering is appropriate when the sequence from an environmental impact statement *or environmental assessment* is: . . . (2) From an environmental impact statement *or environmental assessment* on a specific action at an early stage (such as need and site selection) to . . . a subsequent statement or assessment at a later stage . . ."

40 C.F.R. § 1501.11(c) (2020) (emphasis added).

> Tiering refers to the coverage of general matters in broader environmental impact statements *or environmental assessments* . . . with subsequent narrower statements or environmental analyses . . .").

40 C.F.R. § 1508.1(ff) (2020) (emphasis added).

---

[9] Prior to issuing its final guidance, the CEQ requested public comments on a draft of its guidance. 79 Fed. Reg, 50578-01, 2014 WL 4162146. Following the comment period, the CEQ published its final guidance and responded to the comments, including one "about scenarios where an agency has a PEA that results in a [FONSI] and then tiers to a subsequent project-specific EIS." The CEQ's response was to include examples in the final guidance on how an EIS "may tier from a programmatic EA," such as where a programmatic EA articulates mitigation procedures for a project and then "project-level construction that goes beyond the mitigation in the EA" requires an EIS. Thus, again, the CEQ clearly interpreted its regulations to permit a programmatic EA to tier to a subsequent project-specific EIS. *Id.*

Additionally, the CEQ's 2020 published final rule in amending the regulations explains that the "CEQ proposed to add EAs to [the section on tiering] to codify current agency practice of using EAs where the effects of a proposed agency action are not likely to be significant," and that this amendment was meant "to make clear that this provision is applicable to both EAs and EISs." 85 Fed. Reg. 43304-01, 2020 WL *43324-27. This explanation indicates that the VA's interpretation of tiering in this case was aligned with "current agency practice" of tiering from EAs or EISs but such practice had not yet been explicitly "codified" in the regulations. The 2020 amendments simply made clear that such tiering was appropriate.[10] Therefore, under either version, Crossgate's argument fails.

### B. The VA's "programmatic" EA

Crossgate's second argument is related but distinct from its first. Crossgate argues that despite the VA's first document's label of "Programmatic Environmental Assessment," the document was "insufficient in scope and substance" to be programmatic. [R. 33-1 at 10] Therefore, because the VA's PEA did not analyze "anything broader than a single project for the replacement of the VA hospital in Louisville," [R. 40 at 2], the tiering was improper because the NEPA analysis did not start with a sufficiently broad enough document. [R. 33-1 at 12]  And the VA does not contest the scope of its PEA, acknowledging that it was developed to "assess the potential effects of selecting and acquiring a site in general for the ultimate development of the proposed Medical Center." [R. 36 at 5]

---

[10] The CEQ opened the proposed rulemaking to public comment and on June 30, 2020 published a 600-page response to the comments submitted. *See* Council on Environmental Quality, *Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act Final Rule Response to Comments RIN 0331-AA03*, (June 30, 2020), https://ceq.doe.gov/docs/laws-regulations/ceq-final-rule-response-to-comments-2020-06-30.pdf. The CEQ's response states that the amended provisions relating to tiering "make clear that agencies may use EAs at the programmatic stage for decisions on a program, plan, or policy covering multiple actions, *allowing narrower or site-specific decisions to tier from a programmatic EA*." *Id.* at 147 (emphasis added).

16

As an initial matter, the Court notes that in *National Trust* the VA's first tier was a "programmatic environmental assessment" that was limited in scope to "evaluating site selection, acquisition and site preparation" and the second tier evaluated "design, construction and operation after the respective sites were selected." *National Trust*, 2010 WL 1416729, at *2. Therefore, the district court in *National Trust* saw nothing amiss with the VA's "programmatic EA" that was limited to site selection, acquisition, and preparation.

Moreover, the VA's tiering procedure—starting at site selection and tiering to subsequent analysis at a later stage—is explicitly permitted by the CEQ regulations. 40 C.F.R. § 1508.28. Crossgate focuses on § 1508.28(a) which states tiering is appropriate "[f]rom a program, plan, or policy . . . to a site-specific statement or analysis." Nevertheless, § 1508.28(b) provides an alternative tiering sequence that is appropriate: from "a specific action at an early stage (such as need and site selection) to . . . a subsequent statement or analysis at a later stage (such as environmental mitigation)." The regulation explains that tiering from site-selection to a subsequent statement or analysis "helps the lead agency to focus on the issues which are ripe for decision and exclude from consideration issues already decided or not yet ripe." § 1508.28(b). In other words, "the NEPA statutory scheme provides for two discrete phases of alternative analyses. First, the agency must choose from the universe of options a list of alternatives as 'finalists' that it will study in detail. Second, the agency engages in a more rigorous environmental analysis of these selected finalists before making its ultimate decisions." *Coal. for Advancement of Reg'l Transp. v. Fed. Highway Admin.*, 959 F. Supp. 2d 982, 1003 n.14 (W.D. Ky. 2013), *aff'd,* 576 F. App'x 477 (6th Cir. 2014). Here, the VA did just that. It considered its list of alternatives during the site-selection stage in its PEA, and then engaged in a "more

rigorous environmental analysis of these selected finalists" (Brownsboro and St. Joseph) before making its final decision.

Still, Crossgate insists that the VA's first EA was not a true "programmatic document." [R. 40 at 3] "Major federal action" that requires NEPA review includes "projects" and "programs." § 1508.18(a). A "program" is generally a "group of concerted actions to implement a specific policy or plan," with "systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive." § 1508.18(b)(3). In contrast, an example of a "project" is "construction or management activities located in a defined geographic area." § 1508.18(b)(4). The VA's proposed action was to build a medical center at a new location, which would make it a "project," rather than a program. "Programmatic" documents are generally used to group together related federal actions, such as where several proposals for federal action could have a "cumulative or synergistic" impact within a region or when multiple projects are not geographically connected but are related in time or subject matter. *Oak Ridge Env't Peace All. v. Perry*, 412 F. Supp. 3d 786, 805 (E.D. Tenn. 2019) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 409 (1976)). Therefore, even if the VA "mislabeled" its EA as "programmatic" as Crossgate asserts, the ultimate question is whether its underlying procedure and analysis satisfies its NEPA obligations. "The only role for a court is to insure that the agency has taken a 'hard look' at environmental consequences." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976). Crossgate does not cite any authority that indicates the VA was required to engage in a regional or nationwide analysis when its proposed federal action was limited to selecting a site and building a new medical center on that site. Like the VA in *National Trust*, the VA here started with "site selection, acquisition and site preparation" and tiered to a subsequent site-specific analysis, including "design, construction and operation." *National Trust*,

18

2010 WL 1416729 at *2-3. Further, what the VA did is permitted by the CEQ regulations, which allows a tiered analysis from "a specific action at an early stage (such as need and site selection) to . . . a subsequent statement or analysis at a later stage (such as environmental mitigation)." § 1508.28(b). The Court rejects Crossgate's arguments with respect to the VA's PEA.

### C. The purchase of Brownsboro site as "predetermination"

CEQ regulations prohibit an agency from taking an action that would "limit [its] choice of reasonable alternatives" before the agency issues a record of decision (ROD). 40 C.F.R. § 1506.1(a). An agency might limit its choice of reasonable alternatives by "committing resources" to a specific alternative before completing the NEPA analysis and thus prejudicing the remaining analysis and final selection, turning the NEPA process into a mere justification of an already made decision. 40 C.F.R. § 1502.2(f) ("Agencies shall not commit resources prejudicing selection of alternatives before making a final decision."). Therefore, a federal agency must not "predetermine" the outcome before completing its NEPA analysis, otherwise the analysis is just a "foreordained formality." *Karst Env't Educ. & Prot., Inc. v. Fed. Highway Admin.*, No. 1:10-CV-00154-R, 2011 WL 5301589, at *13 (W.D. Ky. Nov. 2, 2011).

"Arguments that a federal agency has predetermined the outcome of an environmental impact statement must meet a high standard." *Id.* (quoting *Forest Guardians v. U.S. Fish & Wildlife Serv.,* 611 F.3d 692, 714 (10th Cir. 2010)). "Predetermination occurs only when an agency *irreversibly and irretrievably* commits itself to a plan of action that is dependent upon the NEPA environmental analysis producing a certain outcome, before the agency has completed that environmental analysis—which of course is supposed to involve an objective, good faith inquiry into the environmental consequences of the agency's proposed action." *Forest Guardians*, 611 F.3d at 714 (emphasis in original); *Metcalf v. Daley*, 214 F.3d 1135, 1143 (9th

Cir. 2000) (CEQ regulations "require[e] agencies to prepare NEPA documents, such as an EA or

an EIS, before any irreversible and irretrievable commitment of resources.").

Crossgate argues that the VA's purchase of the Brownsboro property prior to completion

of the NEPA process was an "irreversible and irretrievable" commitment of resources that

prejudiced the selection of Brownsboro over the other alternatives and predetermined the VA's

final decision (to select Brownsboro) before the environmental review was complete. [R. 33-1 at

13-18]  Therefore, according to Crossgate, "[e]verything that the VA did in its NEPA review of

the Brownsboro Site following its purchase of the site was to confirm the purchase and the

project," merely justifying the action rather than informing the decision-making process. [R. 33-

1 at 16]

As noted, Crossgate "must meet a high standard to prove predetermination." *Forest

Guardians*, 611 F.3d at 714. It is a "stringent standard" that a court "should not reach lightly." *Id.*

Additionally, although at the outset the VA explicitly identified Brownsboro as its preferred

location, an agency is permitted to identify a "preferred alternative so long as it does not '[l]imit

the choice of reasonable alternatives' to pick the one it likes." *Kentucky Coal*, 804 F.3d at 806.

Therefore, "an agency may prefer one alternative from the outset, but must 'proceed to perform

its environmental tasks with . . . good faith objectivity.'" *Karst Env't Educ. & Prot., Inc.*, 2011

WL 5301589, at *13 (quoting *Sierra Club v. Fed. Highway Admin.*, No. 10–20502, 2011 WL

3281328, at *4 (5th Cir. 2011)); 40 C.F.R. § 1502.14(e) ("[A]gencies shall . . . [i]dentify the

agency's preferred alternative or alternatives" in its EIS). Thus, "[t]he proper inquiry in a NEPA

case is therefore not whether an agency has focused on its preferred alternative, but instead

whether it has gone too far in doing so, reaching the point where it actually has 'limited the

choice of reasonable alternatives.'" *Kentucky Coal Ass'n, Inc. v. Tennessee Valley Auth.*, 68 F. Supp. 3d 703, 718–19 (W.D. Ky.), *aff'd,* 804 F.3d 799 (6th Cir. 2015).

In this case, the VA not only identified a preferred alternative but went a step further and purchased that preferred site (the Brownsboro property) after completing its PEA. The VA argues that this purchase was not an "irreversible and irretrievable commitment of resources" that made all remaining NEPA analysis and decision-making a forgone conclusion. Rather, such a commitment of resources is generally seen when an agency enters a binding contract for a specific result, not when it purchases a property that it retains the discretion to sell or use for another purpose. [R. 36 at 20]

For example, in *Metcalf v. Daley*, 214 F.3d 1135, 1143–44 (9th Cir. 2000) the Ninth Circuit found predetermination where the federal agency had entered into a binding agreement to reach a certain outcome before conducting a NEPA analysis. In *Davis v. Mineta*, 302 F.3d 1104, 1112 (10th Cir. 2002) the Tenth Circuit found predetermination because the "consultant employed to prepare the draft EA" for the agency "was contractually *obligated* to prepare a FONSI and to have it approved, signed and distributed" creating "an inherent, contractually-created bias" in favor of a particular result before the analysis was conducted. The Court agrees with the VA—purchasing the Brownsboro site does not amount to a binding obligation or an *irreversible* commitment to build the medical center there.

In *National Audubon Society v. Department of the Navy*, the Fourth Circuit found that the Navy's EIS analysis on an aircraft landing field was deficient under NEPA and that it needed to complete a supplemental one to satisfy NEPA. *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174 (4th Cir. 2005). The Court then went on to discuss what activities the Navy could still take *before* completing the supplemental EIS, considering § 1506.1(a)'s prohibition on actions that

"limit the choice of reasonable alternatives." *Id.* at 201. The Court concluded that the Navy could move forward with certain activities, including purchasing land for the project. *Id.* at 204–06. The court reasoned that allowing the Navy to purchase land before completing its NEPA analysis and making its "ultimate decision" would not make the location of the landing field "a foregone conclusion," partly because there is "no reason why the Navy could not attempt to resell the land if it decides to build [the landing field] elsewhere." *Id.* at 206. Therefore, purchasing the land would not "pre-commit" the Navy or "unduly influence the Navy's decisionmaking process" in selecting a site for construction of the landing field. *Id.*

Likewise, the VA argues here that throughout the NEPA process after purchasing the Brownsboro site, it "retained the discretion to sell the property or use it for another purpose and to construct the project at any site." [R. 36 at 20] The Court agrees and concludes that the purchase of the Brownsboro site was not an irreversible commitment of resources. *See, e.g., National Trust*, 2010 WL 1416729, at *24 (holding that where "no relocations or demolition" had occurred and only a portion of the land for the new VA medical center had been acquired "do[es] not rise to the level of irretrievable commitment of resources.").

In a similar argument, Crossgate argues that the VA "ignored its own administrative regulations on property acquisition," when it purchased the Brownsboro site, citing to 38 C.F.R. § 26 which "provide[s] guidance to officials of the Department of Veterans Affairs (VA) on the application of the NEPA process to Department activities." 38 C.F.R. § 26.1 [R. 33-1 at 13] As Crossgate points out, these regulations identify "[a]cquisition of land in excess of 10 acres for development of a VA medical center facility" as falling within the "classes of action which normally do require environmental impact statements." 38 C.F.R. § 26.6(a)(1), (ii). Therefore, Crossgate argues, "this project required an EIS from the beginning" and the "VA's decision to

ignore its own administrative regulation" by purchasing the site only after a PEA was arbitrary and capricious. [R. 33-1 at 14-15]

In *Kentucky Coal Ass'n, Inc. v. Tennessee Valley Authority*,[11] the plaintiffs made the same argument, insisting that because the TVA's own NEPA procedures identified certain actions that "normally require an environmental impact statement," the TVA was obligated to prepare an EIS since it had undertaken one of those listed activities. *Kentucky Coal*, 68 F. Supp. 3d at 709. The TVA argued that "'normally' does not mean that an EIS is *always* required" and this Court agreed. *Id.* at 710. The Court held that the TVA had the "discretion to determine whether the 'normal' preparation of an EIS is warranted under NEPA" even though its own procedures indicated an EIS was "normally" required in such circumstances. *Id.* The TVA's decision to prepare an EA instead of an EIS did "not automatically warrant a finding that the review conducted by TVA was arbitrary and capricious." *Id.*  The Sixth Circuit affirmed, explaining that "[n]ormally does not mean always" and that the "TVA retains discretion to prepare only an assessment even when it normally would do otherwise as long as it takes the required close look at its actions." *Kentucky Coal*, 804 F.3d at 805. Likewise, the VA here had the discretion to determine whether the purchase of the Brownsboro site was a situation where an EIS was required. The VA clearly determined it was not, and the Court defers to the VA's interpretation and application of its own regulations.[12] *Coal. for Advancement of Reg'l Transp.*, 959 F. Supp. 2d at 998 (explaining that courts should defer to an agency's reasonable interpretation of its own regulation).

---

[11] 68 F. Supp. 3d 703 (W.D. Ky.) *aff'd*, 804 F.3d 799 (6th Cir. 2015).
[12] Crossgate also points out that the VA's *NEPA Interim Guidance for Projects* (2010) identifies the "siting of a new full-sized medical center" as the "sole example" of an action that "would likely require an EIS based upon potential for impacts." [R. 33-1 at 15; VA-31935]. While that may be true, the section of the *Interim Guidance* document cited by Plaintiff clearly does not always *require* an EIS.

Lastly, Crossgate cites to 40 C.F.R. § 1506.1(c)(2) stating that this regulation requires "an interim action," such as purchasing land, "be accompanied by an adequate EIS." [R. 33-1 at 16] However, § 1506.1(c) applies only to interim actions "which may significantly affect the quality of the human environment." This regulation is inapplicable to the VA's interim purchase of land because "simple title transfers" for land acquisition generally do not significantly affect the environment. *Nat'l Audubon Soc'y*, 422 F.3d at 204. Purchasing land might only cause "negligible" environmental harm and "do[es] not include cutting even a single blade of grass in preparation for construction." *Id.* at 204, 206. Therefore, "the acquisition of land on which the [federal project is] to be constructed" does not implicate NEPA's requirements; rather it is the construction of the federal project "and not the mere acquisition of land, that affect[s] the environment." *United States v. S. Fla. Water Mgmt. Dist.*, 847 F. Supp. 1567, 1580 (S.D. Fla. 1992) *aff'd in part, rev'd in part*, 28 F.3d 1563 (11th Cir. 1994); *City of Oak Creek v. Milwaukee Metro. Sewerage Dist.*, 576 F. Supp. 482, 490 (E.D. Wis. 1983) (explaining "[i]t is the [constructed project] itself, not the land acquisition, that causes the major environmental impact."). The Court rejects Crossgate's arguments with respect to the Brownsboro site.

### D.  Considered Alternatives

Under NEPA regulations, the "heart of the environmental impact statement" is the consideration of reasonable alternatives. 40 C.F.R. § 1502.14. An agency must "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." § 1502.14(a). However, the Sixth Circuit has noted that an "agency may apply a 'rule of reason' in this area and discuss only 'reasonable' alternatives to the proposed action." *Save Our Cumberland Mountains*, 453 F.3d at 346. "NEPA does not require a federal agency to discuss

24

every conceivable alternative to a proposed action . . . To make an impact statement something more than an exercise in frivolous boilerplate the concept of alternatives must be bounded by some notion of feasibility." *Kentucky ex rel. Beshear v. Alexander*, 655 F.2d 714, 718 (6th Cir. 1981) (quoting *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 551 (1978)). Additionally, "the task of determining the set of alternatives that merit consideration is one for the agency in the first instance, and this Court asks only whether the level of consideration of a given alternative was so flawed as to represent an 'abuse of discretion.'" *Id.* Further, it is not the Court's "role to examine the substantive basis on which the agency rested its decision to reject" a potential alternative, rather "[i]t is enough that the record clearly indicates that the agency took the proposed alternative into account, and gave plausible reasons for rejecting it." *Burkholder v. Peters*, 58 F. App'x 94, 101 (6th Cir. 2003).

Crossgate argues that the VA arbitrarily limited its review of reasonable alternatives and failed to evaluate all reasonable alternatives to its proposed action. [R. 33-1 at 18-21] It asserts the VA "unreasonably discarded all urban sites" from consideration; evaluated only one alternative (the Brownsboro site) because the St. Joseph site was headed towards being developed by a new owner; and that the VA "arbitrarily eliminated" the downtown site and Fegenbush site from consideration. [*Id.* at 19]

The Court cannot conclude that the VA's process determining a set of reasonable alternatives to consider was so flawed or that the VA's reasons for rejecting certain sites were so unreasonable and implausible to be an abuse of discretion or arbitrary and capricious. The VA began by first considering five alternatives in its PEA and screening them based on twenty different criteria, including comparing the potential environmental impacts each alternative might have. [VA-00829-32] It then narrowed it down to a first and second preferred alternative,

eliminating the other sites from consideration and explaining why. [VA-08333] Further, the VA

considered a wide range of criteria throughout its screening process, such as general location,

transportation access, space for parking, available utilities, size, cost, and availability, among

other factors. [VA-00823] It explained its reasons for preferring undeveloped "greenfield" sites,

[VA-04326–27], and discussed in detail the proposed alternatives as well as a "no action"

alternative. [VA-08333–35] The EIS then tiered from the PEA, which "incorporate[s] by

reference general discussions contained in an earlier document [the PEA] and concentrate[s]

solely on the issues specific to the subsequent analysis." 40 C.F.R. §§ 1508.28, 1502.20. The EIS

analyzed in detail the two finalists (Brownsboro and St. Joseph) as well as a "no action"

alternative. [VA-04280] The Court declines to further scrutinize the "substantive basis" of the

VA's decision when it is clear it took reasonable alternatives into account and gave plausible

reasons for rejecting them. *Burkholder*, 58 F. App'x at 101.

### E.   Supplemental Analysis

CEQ regulation 40 C.F.R. § 1502.9 requires agencies to prepare supplemental draft or

final EISs when "[t]here are significant new circumstances or information relevant to

environmental concerns and bearing on the proposed action or its impacts." Crossgate argues that

the VA failed to conduct this required supplemental analysis when the VA became aware that

"additional sites may have become available since the beginning of the process in 2010," as well

as "additional information pertaining to traffic and road construction, and the change in status for

the St. Joseph Site availability." [R. 33-1 at 22-23; VA-04280]

The Supreme Court has explained that "an agency need not supplement an EIS every

time new information comes to light after the EIS is finalized." *Marsh v. Oregon Nat. Res.*

*Council*, 490 U.S. 360, 373–74 (1989). If that were required, it "would render agency

decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." *Id.* Consistent with a "rule of reason," an agency need not supplement every time new information comes to light; rather, the need for supplementation "turns on the value of the new information to the still pending decisionmaking process." *Id. See, e.g. Friends of Cap. Crescent Trail v. Fed. Transit Admin.*, 877 F.3d 1051, 1056 (D.C. Cir. 2017) ("[I]f new information arises that presents a *seriously* different picture of the environmental landscape, then the agency must prepare a supplemental EIS." (internal quotations omitted)). In reviewing an agency's decision or inaction on producing supplemental analysis, "[w]hether the agency employed a reasoned-decision-making process is key." *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 444 F. Supp. 3d 832, 855 (S.D. Ohio 2020). Therefore, the question is whether the "agency has made a reasoned decision based on its evaluation of the significance—or lack of significance—of the new information." *Id.*

Additionally, "[a]n agency's determination of whether the information is significant enough to require supplementation is 'a classic example of a factual dispute the resolution of which implicates substantial agency expertise.'" *Coal. for Advancement of Reg'l Transp.*, 959 F. Supp. 2d at 1006. Therefore, "courts 'must defer to the informed discretion of the responsible federal agencies.'" *Id.*

Here, Crossgate asserts that the VA's decision was arbitrary and capricious because it noted in its final EIS that "additional sites *may* have become available." [R. 33-1 at 22; VA-04280] However, the VA explained its reasoned decision for not evaluating those sites:

> reopening the site selection process at this time to identify additional properties that meet VA's siting criteria would require many months or even years to investigate, evaluate, and perform additional environmental analysis on any new sites. Once that reopened process was completed, it too could be criticized because still more sites may become available during the time additional sites were being identified and evaluated. A

27

continuous effort to try to find a site acceptable to all stakeholders would not serve VA's goal of improving Veteran services in the Louisville area.

[VA-04331]

The Court finds that the VA made a reasoned decision in choosing not to reopen its site-selection stage to investigate the *possibility* that new sites might be available. Further, Crossgate's vague reference to "additional information pertaining to traffic and road construction" is not sufficient to show that "significant new circumstances or information" had arisen that was of such value to the decision-making process that the VA was obligated to conduct supplemental analysis. Lastly, contrary to Crossgate's argument, the final EIS did consider the "change in status for the St. Joseph Site availability," noting that the site had come under contract but the sale was dependent on zoning approval and the VA could still negotiate for the purchase of the property. [VA-04351] Therefore, the Court will "defer to the informed discretion" of the VA with respect to its decision not to conduct supplemental analysis.

### F.   Environmental Justice Claim

Executive Order (E.O.) 12898 orders federal agencies to "make achieving environmental justice part of its mission" and identify and address "disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations in the United States."[13] Crossgate argues that the VA "failed to comply" with E.O. 12898 because the VA's environmental justice analysis lacked "depth" and the VA "should be required to meaningfully comply" with the order. [R. 33-1 at 24-25] The VA

---

[13] Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations, 59 Fed. Reg. 7629 (Feb. 11, 1994).

responds that the record is clear that environmental justice was addressed in depth and is more than sufficient under NEPA.[14] [R. 36 at 14-15]

As an initial matter, E.O. 12898 expressly states that it does not "create any right to judicial review involving the compliance or noncompliance of the United States" or its agencies. E.O. 12898, 59 Fed. Reg. 7629, 7633 (Feb. 11, 1994). Both parties acknowledge this, but as the VA also admits, "an agency's analysis of environmental justice issues . . . can be challenged as arbitrary and capricious as with other areas of NEPA analysis." [R. 36 at 15]. In *Latin Americans for Social and Economic Development v. Administrator of Federal Highway Admin.*, 756 F.3d 447 (6th Cir. 2014) the Sixth Circuit recognized that E.O. 12898 "does not create a right to judicial review" but that some courts have still "reviewed environmental justice claims under the APA's arbitrary and capricious standard."[15] Further, the Court noted that the Sixth Circuit had recently affirmed a district court decision that had reviewed an environmental justice claim under such standard. *Id.* (citing *Kentuckians for the Commonwealth v. U.S. Army Corps of Engineers*, 746 F.3d 698, 705 (6th Cir. 2014)). Because the federal agency's environmental justice study was "part of the NEPA analysis" and in the administrative record, the Sixth Circuit proceeded to assume that the plaintiffs "have a right to bring an environmental justice challenge under NEPA"

---

[14] The Court agrees with the VA that "Plaintiffs provide no legal or factual justification for their [environmental justice] argument." [R. 36 at 14] Although Crossgate has asserted its argument in a "skeletal way, leaving the court to put flesh on its bones," and has thus waived the argument, *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997), the Court will nevertheless, in the alternative, briefly analyze whether the VA satisfied its environmental justice obligations.

[15] The Court cited to *Coliseum Square Ass'n, Inc. v. Jackson,* 465 F.3d 215, 232 (5th Cir. 2006) where the Fifth Circuit reviewed an environmental justice claim where the study was part of the federal agency's NEPA analysis and part of the administrative record, thus subject to arbitrary and capricious review. *Latin Americans for Soc. & Econ. Dev.*, 756 F.3d at 465. Likewise, *Coliseum* cited approvingly to *Communities Against Runway Expansion, Inc. (CARE) v. F.A.A.*, 355 F.3d 678, 688 (D.C. Cir. 2004) which held that when a federal agency "exercise[s] its discretion to include the environmental justice analysis in its NEPA evaluation" the environmental justice claim then "arises under NEPA and the APA, rather than [E.O. 12,898] . . . [and] is properly subject to 'arbitrary and capricious' review under the APA." *Communities Against Runway Expansion, Inc.*, 355 F.3d at 689 (D.C. Cir. 2004).

and analyzed whether the federal defendants had satisfied their environmental justice obligations. *Id.* at 476. Likewise, because the VA's environmental justice study was conducted as part of its NEPA analysis and is in the administrative record, this Court will analyze whether the VA satisfied its environmental justice obligations as well.

In *Latin Americans* the Sixth Circuit explained that E.O. 12898 "requires [federal agencies] to consider alternatives to avoid or minimize disproportionately high adverse impacts on minority populations" but that just as NEPA does not require agencies to select the option with the least environmental impact, federal agencies are likewise "not required to select an alternative with the least environmental justice impact." *Latin Americans for Soc. & Econ. Dev.*, 756 F.3d at 476. Thus, "NEPA requires only that the [federal agencies] *consider* the environmental impacts of its projects in making its decisions." *Id.* at 476-77 (emphasis added). "Environmental impacts and environmental justice issues are a consideration in agency decision making, but are not controlling." *Id.* at 477. Where the record shows a federal agency took a "hard look" at environmental justice issues, "reasonably determined its priorities based on all the comparative information available, and made a choice that resulted from a reasoned process," then the federal agency has likely not "violated principles of environmental justice" or made an arbitrary or capricious decision. *Id.*

In the VA's final EIS, the agency considered environmental justice issues, specifically with respect to minority populations and low-income populations. [VA-04474; VA-04572] The EIS outlined detailed population data for the medical center's service area (surrounding counties); explained that "those minority and low income populations living closest to the site are more likely to experience the most adverse effects (e.g., noise, traffic congestion, air pollution, etc.); further identified that no "community of concern (minority or low income) [is]

30

located within the immediate vicinity (1-mile radius) of the [medical center] location" at either alternative site, thus the environmental or health impacts from construction or operation of the medical center "would not be disproportionately borne by any" low income or minority communities. [VA-04573] The Court finds the VA's detailed population data analysis and consideration of the construction and operation effects on the relevant communities satisfies its environmental justice obligations.

### V. Conclusion

Based on the Court's review of the administrative record and the parties' briefs, the Court concludes that the VA fulfilled its obligations under NEPA. Accordingly,

1. The Plaintiff's Motion for Summary Judgment [**R. 33**] is **DENIED**.

2. The Defendants' Motion for Summary Judgment [**R. 37**] is **GRANTED**.

3. A separate Judgment will be entered consistent with this Order.

This the 18th day of March, 2021.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY